Robert G. REEVES, James W. Reeves, and Ross E. Brannian, d/b/a 3R Minerals, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 98–63L.

United States Court of Federal Claims.

Dec. 11, 2002.

Allen K. Young, Young, Kester & Petro, Springville, UT, attorney of record for the plaintiffs.

Susan V. Cook, Environment & Natural Resources Division, Department of Justice, Washington, D.C., attorney of record for the defendant, Christopher D. Fontecchio and Joel Yudson, Office of the Solicitor, Department of the Interior, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Since late 1995, plaintiffs Robert G. Reeves, James W. Reeves, and Ross E. Brannian have operated 3R Minerals as a partnership in mineral exploration and development. 3R Minerals' primary interest is in its mining claims and leases in Garfield County, Utah. Plaintiffs are before this court claiming that defendant improperly denied the plaintiffs the right to explore and mine their validly staked, unpatented mining claims. Plaintiffs assert that this denial constitutes a regulatory taking of the right to mine their otherwise mineable claims in violation of the Fifth Amendment to the United States Constitution.

Congress has declared that, as relevant to this case, it is "in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, [and] (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs ...." 30 U.S.C. § 21a (2000). In furtherance of these objectives, "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase ...." 30 U.S.C. § 22. The legislation required, however, that those citizens seeking mineral rights in public lands comply with federal laws and the regulations prescribed by law. *See id.*

On October 21, 1976, Congress passed the Federal Land Policy and Management Act (FLPMA) §§ 101–707, as codified at 43 U.S.C. §§ 1701–1784. This legislation supplemented the earlier mining laws popularly known as the "General Mining Act of 1872," established further policies and guidelines for managing public lands, and, relevant to this case, policy and guidelines for the management of potential wilderness areas located on the public lands. *See id.* The legislation determined that the national interest would be best served "if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts." 43 U.S.C. § 1701(a)(2).

On March 3, 1980, under the authority of FLPMA, the Department of the Interior (DOI) promulgated regulations applicable to mining on lands under wilderness review, which appear at 43 C.F.R. Subpart 3802 (2001) (Exploration and Mining, Wilderness Review Program). In addition to the DOI regulatory guidance for implementation and interpretation of FLPMA, guidance is also provided in the Bureau of Land Management's (BLM) Interim Management Policy and Guidelines for Lands under Wilderness Review (IMP). The IMP was first published on December 12, 1979. See Interim Management Policy and Guidelines for Land Under Wilderness Review, 44 Fed.Reg. 72013 (Dec. 12, 1979) (IMP (1979)). On July 12, 1983, a revised IMP was published. 48 Fed.Reg. 31854 (1983). This version was revised and adopted in a handbook in 1987. See BLM, H–8550–1, Interim Management Policy for Lands Under Wilderness Review (1987) (IMP (1987)). The current version is found at BLM, H–8550–1, Interim Management Policy for Lands Under Wilderness Review (1995) (IMP (1995)).[1]

On November 14, 1980, pursuant to the requirements of FLPMA, the area where plaintiffs' mining claims were later located was designated by the BLM as the Carcass Canyon Wilderness Study Area (Carcass Canyon WSA). Under FLPMA, after an area of land is designated as a WSA, it undergoes further review to determine whether the lands are suitable for permanent wilderness designation. See 43 U.S.C. § 1782. In 1990, the BLM issued a Final Environmental Impact Statement (EIS) proposing that the Carcass Canyon WSA was not suitable for wilderness preservation. On January 16, 1992, the Secretary of the Department of the Interior (Secretary) forwarded to the President his recommendation that the Carcass Canyon WSA was not suitable for preservation as wilderness. On June 26, 1992, the President adopted and forwarded

the Secretary's recommendation to Congress. To date, Congress has taken no action on the President's recommendation. The area where the plaintiffs' claims are located continues to maintain its status as the Carcass Canyon WSA.

On September 1, 1996, plaintiff Robert G. Reeves located 40 claims within the Carcass Canyon WSA. On September 3, 1996, the BLM recorded the plaintiffs' mining claims.[2] On September 18, 1996, President Clinton designated the Grand Staircase–Escalante National Monument, which included the land on which plaintiffs' mining claims were located. The Presidential proclamation provided that "[a]ll Federal lands and interests in lands within the boundaries of this monument are hereby appropriated and withdrawn from entry, location, selection, sale, leasing, or other disposition under the public land laws, other than by exchange that furthers the protective purposes of the monument." The presidential designation, however, stated, "[t]he establishment of this monument is subject to valid existing rights." In June 1997, 3R Minerals submitted to BLM a Notice of Intent to Commence Small Mining Operations and a Plan of Operations (the June 1997 Plan), detailing a plan to begin mining its claims within the Carcass Canyon WSA. The June 1997 Plan was also submitted to the Utah Division of Oil, Gas and Minerals (DOGM).

According to the joint stipulations submitted by the parties, plaintiffs' June 1997 Plan was "accepted" by the Utah DOGM on July 3, 1997, and that acceptance of such notice constituted state approval to commence the plaintiffs' mining operations. The Utah DOGM, however, notified 3R Minerals that the BLM also must approve the plan before any mining activities could be commenced on land within the Carcass Canyon WSA. On July 24, 1997, BLM denied the June 1997 Plan because "[t]he proposed action was not

---

1. This policy is referred to as the "interim" management policy because it applies to specific areas of the public lands for a limited amount of time, depending on the schedules for various categories of public lands. IMP at 1 (1995).

2. For a nominal sum, and after certain statutory conditions are fulfilled, an individual may patent

the mining claim, thereby purchasing from the Federal Government the land and minerals and obtaining ultimate title. United States v. Locke, 471 U.S. 84, 86, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). In the present case, plaintiffs do not claim that they hold patented mining claims.

in conformance with the IMP.... [T]he proposed action is proposed within a WSA and would cause surface disturbance, the activity would not be in conformance with the IMP (BLM Manual H–8550–1)."

In November 1997, 3R Minerals submitted to BLM a Notice of Intent to Conduct Exploration and a Plan of Operations (November 1997 Plan), requesting permission to explore its claims located within the Carcass Canyon WSA. The November 1997 Plan was also submitted to the Utah DOGM for state approval. Plaintiffs' November 1997 Plan was "accepted" by the Utah DOGM on December 12, 1997. Again, the Utah DOGM notified the plaintiffs that because the proposed project was within the Carcass Canyon WSA, which is subject to BLM administration, they must obtain written approval by the BLM prior to commencement of the project. On December 30, 1997, BLM denied the November 1997 Plan based on the IMP, concluding that "no actions which would cause surface disturbance [could] be authorized within a WSA."

3R Minerals appealed both BLM decisions to the DOI Board of Land Appeals (IBLA). The two appeals were consolidated. On April 22, 1999, the IBLA affirmed the denials of the Plans of Operation, upholding BLM's application of the nonimpairment standard under section 43 U.S.C. § 1782(c) of FLPMA to the plaintiffs' June 1997 and November 1997 Plans. *3R Minerals,* 148 IBLA 229 (1999).

3R Minerals continues to hold the same forty unpatented mining claims at issue in this litigation. Before this court, plaintiffs allege that BLM and the IBLA erred in applying the nonimpairment standard to evaluate 3R Minerals' proposals. Plaintiffs contend that the § 1782(c) nonimpairment standard does not apply to WSAs deemed not to be suitable for wilderness preservation. Specifically, plaintiffs argue that the non-impairment standard ceased to apply once the Secretary and the President forwarded a recommendation to Congress adopting the position of the BLM's Final EIS, which concluded that the Carcass Canyon WSA was not suitable for preservation as wilderness. Thus,. plaintiffs argue that

the nonimpairment standard no longer applies to the mining claims located within the Carcass Canyon WSA. Plaintiffs contend that the lands found not suitable for preservation as wilderness should be managed under the less· stringent "unnecessary or undue degradation" standard pursuant to 43 C.F.R. § 3809.2. Plaintiffs conclude that because BLM applied an incorrect standard, resulting in the denial of plaintiffs' rights to explore and mine their claims, BLM has effected a regulatory taking of plaintiffs' property in violation of the Fifth Amendment to the United States Constitution. Plaintiffs alternatively argue that even if the nonimpairment standard applies, this regulation goes "too far" in depriving plaintiffs of all viable economic use of their property. Thus, plaintiffs maintain application of the nonimpairment standard itself constitutes a taking requiring just compensation.

Defendant's position is that no taking has occurred because plaintiffs obtained only limited property rights when they filed and recorded their unpatented mining claims with BLM. According to the defendant, the land on which plaintiffs' claims are located was designated a WSA before the plaintiffs staked their claims. The defendant argues that because plaintiffs never acquired an absolute right to mine their claims, BLM has not deprived plaintiffs of any property interest to which they were entitled. The defendant adds that the review process for the Carcass Canyon WSA does not terminate until Congress has acted on the President's recommendation that the land is not suitable for preservation as wilderness. Because Congress has not taken final action regarding the Carcass Canyon WSA, defendant argues that the land on which plaintiffs' mines are located remains subject to the nonimpairment standard mandated under section 1782(c) of FLPMA.

## DISCUSSION

The parties have filed cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar

both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y*

*of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct.

1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville*

*Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

**Standard Applied to Mining Claims in a WSA**

In the present case, plaintiffs have alleged that the government has committed a taking by excessively regulating plaintiffs' use of their unpatented mining claims. The issues presented are whether plaintiffs' mining claims are subject to the nonimpairment standard of section 1782(c) of FLPMA, or whether the "unnecessary or undue degradation" standard of section 1782(c), should apply. Moreover, as discussed in the second

portion of the opinion, plaintiffs' assert that whichever standard applies, there has been a regulatory taking of plaintiffs' mining claim.

FLPMA, 43 U.S.C. § 1701–1784, was passed to establish policies and guidelines for the management of public lands.[3] *See* 43 U.S.C. § 1701(a). Under FLPMA, these public lands are administered by the BLM, a division within the DOI. 43 U.S.C. § 1731(b) *See* S.Rep. No. 94–583, at 24 (1975), *reprinted in Comm. on Energy & Natural Res., 96th Cong., Legislative History of the Fed. Land Policy & Mgmt. Act of 1976,* at 89 (1978).

FLPMA requires DOI to recognize competing interests. DOI must manage the public lands:

> in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8). FLPMA simultaneously directs DOI to manage the public lands "in a manner which recognizes the Nation's need for domestic resources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to the public lands." 43 U.S.C. § 1701(a)(12). To give effect to these competing values, Congress directed BLM to manage public lands on the basis of "multiple use" and "sustained yield." 43 U.S.C. §§ 1701(a)(7), 1732(a). The term "multiple use" is defined in the statute as follows:

> [T]he management of the public lands and their various resource values so that they are utilized in the combination that will

best meet the present and future needs of the American people ... a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources ....

43 U.S.C. § 1702(c). The term "sustained yield" means "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* at § 1702(h). In managing the public lands, the Secretary is directed to prevent unnecessary or undue degradation of the lands.[4] 43 U.S.C. § 1782(c).

FLPMA established a procedure for identifying and designating certain lands to be preserved in their natural condition as wilderness. 43 U.S.C. § 1782(a). Under section 1711(a) of FLPMA, the Secretary must "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values ...." 43 U.S.C. § 1711(a). From this inventory, the Secretary must review the roadless areas of 5,000 acres or more and identify those areas that have "wilderness characteristics." 43 U.S.C. § 1782(a). As adopted by FLPMA, "[w]ilderness" is defined in the Wilderness Act of September 3, 1964, § 16 U.S.C. 1131(c) (1994). An area of wilderness is defined to mean:

> A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of underdeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to

---

**3.** As used in FLPMA and this opinion, the term "public lands" means lands owned by the United States and administered by the BLM, excepting Outer Continental Shelf and native trust lands. 43 U.S.C. § 1702(e).

**4.** The unnecessary or undue degradation standard is defined as follows:

> impacts greater than those that would normally be expected from an activity being accomplished in compliance with current standards and regulations and based on sound practices, including use of the best reasonably available technology.

43 C.F.R. § 3802.0–5(*l*) (2001).

preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). A WSA is defined as the following:

> [A] roadless area of 5,000 acres or more or roadless islands which have been found through the Bureau of Land Management wilderness inventory process to have wilderness characteristics (thus having the potential of being included in the National Wilderness Preservation System), and which will be subjected to intensive analysis through the Bureau's planning system, and through public review to determine wilderness suitability, and is not yet the subject of a Congressional decision regarding its designation as wilderness.

43 C.F.R. § 3802.0–5(c). Once DOI determines that an area of public land exhibits wilderness characteristics, the Secretary must manage those lands under differing standards depending on the existing uses conducted on October 21, 1976, the date FLPMA was enacted. 43 U.S.C. § 1782(c).

First, public lands possessing wilderness characteristics and free of existing uses on October 21, 1976, must be managed, under DOI authority, in a manner which does not impair the suitability of the area for preservation as a wilderness. 43 U.S.C. § 1782(c). Second, for those public lands which possess both wilderness characteristics and are subject to the continuation of existing mining and grazing uses and mineral leasing conducted on October 21, 1976, Congress directed DOI to manage these lands so as to "prevent unnecessary or undue degradation of the lands and their resources ...." 43 U.S.C. § 1782(c).

Once BLM has designated an area of land as a WSA, the Secretary is directed to conduct an intensive study of the WSA and make recommendations to the President as to the suitability or nonsuitability of the WSA for preservation as wilderness. 43 U.S.C. § 1782(a). Within two years of the receipt of the Secretary's recommendation, the President must advise Congress of his recommendations with respect to the suitability of each WSA for preservation as wilderness. 43 U.S.C. § 1782(b). A recommendation of the President to designate an area as a wilderness becomes effective only if so provided by an Act of Congress. 43 U.S.C. § 1782(b).

Plaintiffs argue that once the President forwarded his recommendations to Congress adopting the position of the Final EIS report that the Carcass Canyon WSA was not suitable for preservation as wilderness, the strict nonimpairment standard no longer applied, and the default "unnecessary or undue degradation" standard applied instead. Plaintiffs claim that § 1782(c) distinguishes between those lands that the President recommends to Congress for wilderness preservation and those lands the President does not recommend for wilderness preservation. Plaintiffs' interpretation of § 1782(c) would apply the nonimpairment standard to the former, while applying the less rigorous standard of unnecessary or undue degradation to the latter. *See* 43 U.S.C. § 1782(c).

■ In matters of statutory construction, this court's analysis begins with the plain language of the statute. *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *Carter v. United States,* 530 U.S. 255, 257, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *Duncan v. Walker,* 533 U.S. at 167, 121 S.Ct. 2120; *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *Duncan*

*v. Walker,* 533 U.S. at 174, 121 S.Ct. 2120 (noting that court's should not treat statutory terms as "surplusage"). " '[W]hen two statutes are capable of co-existence ... it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)); *Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

A court must not stray from the statutory definition of a term. *See Stenberg v. Carhart,* 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Meese v. Keene,* 481 U.S. 465, 484–485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene,* 481 U.S. at 484–85, 107 S.Ct. 1862. As the United States Court of Appeals for the Federal Circuit stated in *AK Steel Corp. v. United States:*

> When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.

226 F.3d 1361, 1372 (Fed.Cir.2000). When a word is undefined, court's regularly give that term its ordinary meaning. *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); *AK Steel Corp. v. United States,* 226 F.3d at 1371.

A singular term, however, may not be read in isolation. *See Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 852, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.,* 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). The "meaning of a provision is 'clarified by the remainder of the statutory scheme ....' " *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 217–18, 121 S.Ct.

1433, 149 L.Ed.2d 401 (2001) (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) and describing statutory construction as a "holistic endeavor"). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.)).

■ When the statute provides a clear answer, the court's analysis is at an end. *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 254, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). Thus, when the " 'statute's language is plain, "the sole function of the courts is to enforce it according to its terms." ' " *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such an instance, the court will not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.1994) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that a court must not defer to agency interpretation contrary to intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative his-

tory that has no statutory reference point.'" *Shannon v. United States*, 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (citing *Ratzlaf v. United States*, 510 U.S. 135, 147–148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.")).

■ There are select instances when resorting to legislative history is proper. For example, a court may consider legislative history if:

the plain meaning produces a result that is not just "harsh," *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), "curious," *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 172, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), or even "stark and troubling," *Estate of Cowart [v. Nicklos Drilling Co.]*, 505 U.S. [469] at [483], 112 S.Ct. [2589] at 259[8], [120 L.Ed.2d 379 (1992)] but "so bizarre that Congress 'could not have intended' it," *Demarest v. Manspeaker*, 498 U.S. 184, 186, 190–91, 111 S.Ct. 599, 601–02, 603–04, 112 L.Ed.2d 608 (1991).

*Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391. Moreover, legislative history may be introduced into the analysis to resolve an ambiguous statute. *Ratzlaf v. United States*, 510 U.S. at 148 n. 18, 114 S.Ct. 655 (citing *Barnhill v. Johnson*, 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); *Patterson v. Shumate*, 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

"If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 580, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)), *reh'g denied* 469 U.S. 1230, 105 S.Ct. 1235, 84 L.Ed.2d 371 (1985). "'[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation'" because of the likelihood that those in opposition tend to overstate the reach of the bill in question. *Bryan v. United States*, 524 U.S. 184, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)). Moreover, statements by individual legislators should not be given controlling weight, although such statements may evidence congressional intent when consistent with statutory language and other pieces of legislative history. *Brock v. Pierce County*, 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (citing *Grove City Coll. v. Bell*, 465 U.S. 555, 567, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)).

"'[S]ubsequent history is less illuminating than the contemporaneous evidence.'" *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 170, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting *Hagen v. Utah*, 510 U.S. 399, 420, 114 S.Ct. 958, 127 L.Ed.2d 252, *reh'g denied*, 511 U.S. 1047, 114 S.Ct. 1580, 128 L.Ed.2d 222 (1994)); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77, n. 6, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight ... and the views of the committee of one House of another Congress are of even less weight."). *But cf. Loving v. United States*, 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("" 'Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.'"") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367,

380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969))). In this regard, a court should give little weight to attempts to infer Congressional intent to adopt judicial interpretations of a statutory provision when Congress revises the statutory scheme, but fails to amend the provision in question. *See Alexander v. Sandoval,* 532 U.S. 275, 292, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Similarly, " 'failed legislative proposals are "a particularly dangerous ground on which to rest an interpretation of a prior statute." ' " *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. at 170, 121 S.Ct. 675 (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579, (1990))).

Section 1782 of FLPMA sets out the standards for managing lands under wilderness review. The plain language of section 1782, however, provides no clear answer regarding which standard to apply when evaluating mining plans on WSAs which the Secretary and the President have found not suitable for preservation as wilderness, but upon which Congress has not acted. Section 1782, in pertinent part, states:

(a) *Lands subject to review and designation as wilderness.*

Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory required by section 1711(a) of this title as having wilderness characteristics described in the Wilderness Act of September 3, 1964 ... and shall from time to time report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness ....

(b) *Presidential recommendation for designation as wilderness.*

The President shall advise the President of the Senate and the Speaker of the House of Representatives of his recommendations with respect to designation as wilderness

of each such area .... Such advice by the President shall be given within two years of the receipt of each report from the Secretary. A recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress.

(c) *Status of lands during period of review and determination.*

During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976: *Provided,* That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection.

43 U.S.C. § 1782 (emphasis in original). The management responsibility described in § 1782(c) is referred to as the nonimpairment standard. IMP at 2 (1995). For the lands described in § 1782(c), which proceed through the process described and on which a recommendation for wilderness designation is made by the Secretary and the President, the non-impairment standard remains in effect until Congress acts. The difficulty in the current case is that although the Secretary and the President have recommended no wilderness preservation with respect to the WSA at issue, the Congress has not acted.

The defendant argues that because § 1782(c) establishes the standard "during the period of review" and § 1782(a) describes the "lands subject to review," the 1782(c) standard applies to "those roadless areas ... identified during the inventory ... as having wilderness characteristics ...." 43 U.S.C. § 1782(a). In other words, the defendant maintains that any area designated as a WSA remains subject to the non-impairment stan-

dard of § 1782(c), until Congress "determines otherwise," regardless of whether or not a recommendation to designate the area as a wilderness is made by the Secretary and the President.

The plaintiffs, however, argue that once the Secretary and the President have determined a WSA is not suitable for designation as wilderness, the landowners should be allowed to proceed whether or not Congress has acted. The plaintiffs note that in § 1782(b), the Act specifies guidelines for areas which the President has recommended for wilderness preservation. Thus, the plaintiffs appear to argue that "such areas" identified in § 1782(c), refer only to the areas discussed in the last sentence of § 1782(b), those areas which the Secretary and the President have found suitable for designation as wilderness.

The plain text of § 1782(c) does not directly address the factual situation before this court. The statute does not establish a separate management standard applicable to WSAs which the Secretary and the President have determined to be unsuitable for wilderness preservation, but upon which Congress has not acted. Plaintiffs argue, although not persuasively, that the statutory language in § 1782(b) is directed only to what should occur when the recommendation of the Secretary and the President is that a particular area should be designated as wilderness. The facts before this court, however, present a decision by the Secretary and the President not to designate the Carcass Canyon WSA for wilderness preservation. The ambiguity occurs in the words "[t]he President shall advise . . . of his recommendations with respect to designation as wilderness," 43 U.S.C. § 1782(b), and whether that section of the statute directs the President to advise the Congress with respect to both a recommendation to designate and one not to designate as wilderness. Plaintiffs try to argue that the words in § 1782(b), "[A] recommendation of the President for designation as wilderness shall become effective only if so provided by an Act of Congress," be read by themselves to mean that Congress only has a role to act under the statute regarding designation of wilderness areas and that Congress

reserved to itself no role regarding areas deemed by the Secretary and the President not suitable for designation.

The words included in 43 U.S.C. § 1782(c), however, shed further explanation on how to interpret § 1782 in its entirety.

(c) *Status of lands during period of review and determination*

During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976: *Provided,* That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection.

43 U.S.C. § 1782(c).

Because the statutory language is not clear, however, the court will resort to other sources to determine the legislative intent. As is discussed below, when read in conjunction with all of 43 U.S.C. § 1782, the legislative history, the implementing regulations to the statute, agency interpretations, the case law, albeit not in binding precedent, as well as an earlier opinion issued by the Department of Legal Counsel at the United States Department of Justice, it appears that Congress intended to reserve for itself a greater role than just to approve only the areas of wilderness to be finally so designated. It appears that Congress intended that identified WSAs should be preserved in their non-impaired status until Congress has had an opportunity to act on recommendations of the Secretary and the President for either designation or non-designation as wilderness.

The original House version of FLPMA included an additional section, § 311(d), immediately following the enacted version of § 1782(c), which was not adopted in the final

version of FLPMA. Proposed section 311(d) stated:

Where the President recommends pursuant to subsection (b) of this section that a roadless area or island is not suitable for inclusion in the wilderness system, that recommendation shall take effect unless disapproved by a resolution of either the Senate or the House of Representatives before the end of one hundred and twenty days (not counting days on which the Senate or the House of Representatives has adjourned for more than three consecutive days) beginning on the day such recommendation has been submitted to the two Houses.

H.R. 13777, 94th Congress, 2d Sess. § 311(d) (1976), *reprinted in Comm. on Energy & Natural Res., 94th Cong., Legislative History of the Fed. Land Policy & Mgmt. Act of 1976,* at 288 (1978). According to the House Report, "[s]ubsection (d) [§ 311] provides options whereby areas which the President has recommended as being non-suitable as wilderness either can be restored with minimum delay to full multiple-use management or considered further by the Congress for possible inclusion in the National Wilderness Preservation System." H.R.Rep. No. 94–1163, at 17 (1976), *reprinted in Comm. on Energy & Natural Res., 94th Cong., Legislative History of the Fed. Land Policy & Mgmt. Act of 1976,* at 447 (1978). The proposed subsection (d) would have allowed a President's recommendation to terminate the review period absent congressional action if Congress failed to act within 120 days of the President's recommendation. However, when the House and Senate versions were considered by the Conference Committee, the Committee deleted subsection (d) entirely. H.R. Conf. Rep. No. 94–1724, at 47 (1976), *reprinted in Comm. on Energy & Natural Res., 94th Cong., Legislative History of the Fed. Land Policy & Mgmt. Act of 1976,* at 917 (1978). The legislative history also included the following statement on § 311: "While tracts are under review, they are to be managed in a manner to preserve their wilderness character, subject to continuation of existing grazing and mineral uses and appropriation under the Mining Laws." H.R.Rep. No. 94–1163, at 17 (1976), *reprinted*

*in Comm. on Energy & Natural Res., 94th Cong., Legislative History of the Fed. Land Policy & Mgmt. Act of 1976,* at 447 (1978).

Although the Conference Committee Report did not offer a reason for deleting proposed § 311(d), the debate within the Conference Committee reveals some of the congressional concerns. During the Conference Committee discussions, Congressman Seiberling expressed a concern that "even where you had something that was statutorily made part of the study, or had previously been withdrawn and was covered by the 15–year review period, that some special interests could get the Secretary to knock it out and the period of review would terminate." 6 U.S. Op. Off. Legal Counsel 63, 68 (1982) (quoting Transcript of Conference Committee on S. 507, 94th Cong., 2d Sess., at 88–97). After debate, § 311(d) was deleted and the statute was enacted to require an affirmative decision by Congress to make effective a recommendation of the President for a WSA to be designated as wilderness. 43 U.S.C. § 1782(b).

■ In addition to examining the legislative history, interpretations issued by the regulatory agency also provide insight into the purpose behind § 1782 of FLPMA. This court will defer to an agency's interpretation and discretion if the regulation "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The BLM is the agency within the DOI charged with administering the FLPMA. The BLM issued regulations pertaining to section 1782 of FLPMA, which are codified at 43 C.F.R. § 3802.

■ Plaintiffs cite to 43 C.F.R. § 3802.0–5(d), the definition of "Impairment of suitability for inclusion in the Wilderness System," to argue that the nonimpairment standard applies only until the Secretary makes a recommendation to the President. Plaintiffs argue that: "[W]hen the Congressionally mandated review period ended, during which no mineral studies were completed [a requirement prior to recommendation for

Wilderness preservation], and a final Environmental Impact Statement was published stating that the Carcass Canyon Wilderness Study Area was not suitable for Wilderness designation, that the strict non-impairment management standard no longer applied to these claims."

The cited regulation reads:

*Impairment of suitability for inclusion in the Wilderness System* means taking actions that cause impacts, that cannot be reclaimed to the point of being substantially unnoticeable in the area as a whole by the time the Secretary is scheduled to make a recommendation to the President on the suitability of a wilderness study area for inclusion in the National Wilderness Preservation System or have degraded wilderness values so far, compared with the area's values for other purposes, as to significantly constrain the Secretary's recommendation with respect to the area's suitability for preservation as wilderness.

43 C.F.R. § 3802.0–5(d). The regulation does not state, as plaintiff's would have us believe, that the time the Secretary makes a recommendation to the President signals the end of the applicability of the nonimpairment standard. Rather, the regulation explains that preventing impairment of suitability includes preventing impacts that cannot be reclaimed by "the time the Secretary is scheduled to make a recommendation to the President . . . ." *Id.* Although not specifically addressed, logically, if Congress was concerned that the Secretary's decision should not be constrained, that concern would continue until the Congress had acted as well. If the nonimpairment standard were to cease to apply after the Secretary's recommendation, characteristics the Secretary found sufficient for wilderness designation, or that the Congress might find significant, might be degraded to a point where the land is no longer suitable as wilderness by the time Congress acts.

Plaintiffs also argue that 43 C.F.R. § 3802.1–5(c) applies to exempt plaintiffs' mining claims from the nonimpairment standard because the areas had been inventoried and a final decision had been reached that the areas do not contain wilderness charac-

teristics. Plaintiffs argue that "the wilderness review process has been unquestionably completed." Section 3802.1–5(c) states:

(c) Upon receipt of a plan of operations for mining activities commencing after the effective date of these regulations, the authorized officer may notify the operator, in writing, that:

(1) In an area of lands under wilderness review where an inventory has not been completed, an operator may agree to operate under a plan of operations that includes terms and conditions that would be applicable in a wilderness study area. Without an agreement to this effect, no action may be taken on the plan until a wilderness inventory is completed;

(2) The area has been inventoried and a final decision has been issued and become effective that the area does not contain wilderness characteristics, and that the mining operations are no longer subject to these regulations; or

(3) The anticipated impacts are such that all or part of the proposed mining operations will impair the suitability of the area for preservation as wilderness, and therefore, the proposed mining operation cannot be allowed.

43 C.F.R. § 3802.1–5(c). Plaintiffs argue that § 3802.1–5(c)(2) applies only to WSAs that have been determined not to be suitable for wilderness preservation, and that, therefore, according to plaintiffs, the nonimpairment standard of 43 C.F.R. § 3802 should not apply to the plaintiffs' mining claims. To be sure, land that is identifiable as not containing the minimum wilderness characteristics at the initial inventory stage and are not included in the WSAs, are no longer subject to the nonimpairment standard. Subsection (c)(2), however, does not appear to address land that has been designated as a WSA after the inventory process. Furthermore, there is nothing in section 3802.1–5(c) to suggest that WSAs determined to be unsuitable for wilderness by the Secretary and the President can be managed free of the nonimpairment standard, prior to congressional action on the Executive Branch decision.

In addition to the regulations published in the C.F.R., the BLM has issued guidelines in

the IMP for applying the nonimpairment standard. *See* IMP at 1 (1995). Because plaintiffs located their claims in September, 1996, the 1995 version of the IMP governs the plaintiffs' claims. Under the section entitled "Meaning of the Congressional Mandate of Nonimpairment," the BLM explains how to apply the nonimpairment standard. *See* IMP at 3–4 (1995). The IMP directs the Secretary to prevent "impairment" of an area's "suitability for preservation as wilderness." *Id.* The term "suitability" includes two prongs. First, the area must satisfy the definition of wilderness as provided in the Wilderness Act, 16 U.S.C. § 1131(c). Once an area is identified as having wilderness characteristics and designated a WSA, the Secretary must ensure that this area continues to meet the definition of wilderness "until designated as wilderness or released for other uses." IMP at 4 (1995). On November 14, 1980, BLM determined that the area on which plaintiffs' claims were located satisfied the definition of wilderness and designated the Carcass Canyon WSA.

Plaintiffs argue that the Carcass Canyon WSA no longer possesses wilderness characteristics because the area "is not roadless nor untrammeled by man[,] . . . Mining operations have been conducted on Plaintiffs' claims as recently as 1988[,] . . . [and][t]he Final EIS concluded that only 57% of the Carcass Canyon Study area had outstanding solitude and only 25% had primitive recreational character." Yet, this court cannot make an initial determination regarding whether the Carcass Canyon WSA meets the definition of wilderness. The Secretary is responsible for conducting an inventory of all eligible lands, identifying the areas with wilderness characteristics, and designating those areas as WSAs. 43 U.S.C. § 1782(a). The Secretary then recommends to the President, in this case, that the Carcass Canyon WSA is not suitable for preservation as wilderness. The Secretarial and Presidential determinations, however, do not negate the Secretary's initial inventory finding that the Carcass Canyon WSA displayed wilderness characteristics.

The second prong of "suitability" in 43 U.S.C. § 1782(c), is designed to ensure that the lands "are not degraded so far, compared with the area's values for other purposes, as to significantly constrain the Congress' prerogative to either designate a WSA as wilderness or release it for other uses." IMP at 4 (1995). Although all WSAs possess minimum wilderness characteristics by definition, a WSA may be found not suitable because its value for other purposes outweighs its wilderness value. Thus, the BLM must ensure that an a WSA's relative value as wilderness will not decrease as compared to the WSA's other values. Plaintiffs argue that the Secretary has already found that the Carcass Canyon WSA is not suitable because the Final EIS reported that "the area's mineral values outweigh the wilderness values." However, the IMP directs that Congress makes the final decision regarding suitability: "[I]t seems clear that the Secretary must protect the wilderness values of *each* WSA until Congress makes the final decision regardless of the suitable/nonsuitable recommendation made." *Id.* at 4 (emphasis in original). Once the Secretary has designated an area as a WSA, only Congress can release the lands for other purposes. As stated in the IMP: "Management under the nonimpairment standard protects Congress' prerogative to make the designation decision by preventing actions that would pre-empt that decision." IMP at 5 (1995).

Plaintiffs have failed to cite language in any of the three versions of the IMP to show that the nonimpairment standard should not apply until Congress has made a final determination regarding WSA's suitability as wilderness. To the contrary, both of the previous versions of the IMP articulated a standard consistent with the current IMP. In the section entitled "Introduction," both of the previous IMP versions state "[t]he Interim Management Policy is temporary and applies only during the time an area is under wilderness review and until Congress acts on wilderness study areas." IMP at 2 (1987); IMP at 72014 (1979). All three versions of the IMP express a consistent purpose behind the nonimpairment standard: "Management under the nonimpairment standard protects Congress' right to make the designation decision by preventing actions that would pre-empt that deci-

sion." IMP at 72016 (1979); IMP at 7 (1987); IMP at 5 (1995).[5]

Plaintiffs further contend that the "regulations require" WSAs found unsuitable as wilderness to be "managed under standards of undue degradation, similar to 'grandfathered' uses or 'valid existing rights.'" Section 1782(c) of FLPMA states that the nonimpairment standard will apply "subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976." 43 U.S.C. § 1782(c). The IMP specifically lists "grandfathered uses" and "valid existing rights" as exceptions to the nonimpairment criteria. *See* IMP at 9,12 (1995). These enumerated exceptions allow the Secretary to manage these lands under the less stringent, default management standard, "unnecessary or undue degradation." IMP at 12–13 (1995) Neither the statute nor the regulations issued by BLM contain a parallel exception for WSAs found unsuitable for wilderness designation by the Secretary and/or the President before Congress has acted. Plaintiffs attempt to equate the present situation with the status of a specifically enumerated exception in hopes that the default management standard of "unnecessary or undue degradation" would apply, but the statute and the regulations fail to support such an exception. Plaintiffs do not argue that their mining claims qualify under one of the enumerated exceptions, so their claims must be treated like any other claims located on a WSA.

Relevant decisions of the DOI Board of Land Appeals also demonstrate the agency's reading of § 1782 is consistent with the decisions included in FLPMA's legislative history and the BLM directives. *See Dave Paquin*, 129 IBLA 76, 77 (1994) ("[E]ven though [BLM] had not recommended the WSA for wilderness classification, nevertheless management of the area to prevent impairment was required until Congress decided whether it should become part of the wilderness system."); *Robert L. Baldwin, Sr., and E. Rose Baldwin*, 116 IBLA 84, 88 (1990) ("The final

determination regarding the area's inclusion or noninclusion in the wilderness system lies with Congress, and the Department's duty to manage the lands consistent with the nonimpairment standard remains unchanged until Congress has acted.").

Furthermore, Federal Courts reviewing the application of the nonimpairment standard in § 1782(c) have also interpreted the section to apply to all WSAs until Congress acts on the recommendation by President. In *Rocky Mountain Oil and Gas Association v. Watt*, the United States Court of Appeals for the Tenth Circuit considered whether the nonimpairment standard applied to plaintiffs' mineral leases. *Rocky Mountain Oil and Gas Assoc. v. Watt*, 696 F.2d 734, 744 (10th Cir.1982). In examining whether plaintiffs' mineral leases qualified as a "grandfathered" use, the court observed that "[t]he purpose of the WSA management scheme is to maintain the status quo existing October 21, 1976, so that lands then suitable for wilderness consideration will not be rendered unfit for such consideration before the Secretary makes a recommendation and the Congress acts on the recommendation under section 603(a) and (b)." *Id.* at 749. According to the Tenth Circuit "[o]ne of the prime concerns of Congress in enacting the FLPMA was that BLM lands suitable for wilderness preservation at the date of the Act's passage be given a chance for consideration as wilderness." *See id.; see also Sierra Club v. Watt*, 608 F.Supp. 305, 334–35 (E.D.Cal.1985).

The Tenth Circuit recently addressed the application of the nonimpairment standard of § 1782(c) again and stated the following:

In 1976, Congress enacted the FLPMA, a complex and comprehensive statute that created a versatile framework for governing the BLM's management of public lands. The Act required that the Secretary of the Interior prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values. During the inventory process, the Secretary was to identify roadless areas of five thousand acres or more and roadless

---

5. The 1995 IMP replaced the word "right" in the quoted segment with the word "prerogative."

IMP 1995 at 5.

islands of the public lands that possessed wilderness characteristics. The process of identifying lands having wilderness characteristics involved two steps. First, the BLM conducted an initial inventory, during which it identified wilderness inventory units, which were defined as roadless areas of 5000 acres or more that *may* have wilderness characteristics. After completing this initial inventory, the BLM then conducted an intensive inventory of these units to determine whether the units possessed wilderness characteristics. Areas found by the BLM to possess wilderness characteristics were then designated by the BLM as Wilderness Study Areas, or WSAs. The Act mandated that, within fifteen years of the FLPMA's enactment, the Secretary review the WSAs and recommend to the President which WSAs would be suitable for preservation as wilderness. The FLPMA required that, two years after receiving the Secretary's report, the President submit to Congress his recommendations with respect to designation as wilderness of each such area.

The FLPMA, however, provides that only Congress may actually designate land for wilderness preservation. Consequently, until Congress either affirmatively designates or expressly rejects a particular WSA for wilderness preservation, the FLPMA mandates that the BLM *shall continue* to manage the WSAs in a manner so as *not to impair* the suitability of such areas for preservation as wilderness. Thus, once land is designated as an WSA, the FLPMA imposes an immediate and continuous obligation on the BLM to manage such parcels in such a way that they will remain eligible for wilderness classification should Congress decide to designate the areas for permanent wilderness preservation.

*S. Utah Wilderness Alliance v. Norton,* 301 F.3d 1217, 1224–25 (10th Cir.2002) (emphasis in original) (citations omitted); *see also Utah v. Babbitt,* 137 F.3d 1193, 1198 (10th Cir. 1998) ("An Act of Congress is necessary to designate public lands as wilderness.").

In addition, in 1982, the United States Department of Justice, Office of Legal Coun-

sel, was asked for a formal review and opinion regarding "whether § 603 of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1782 (1976), authorizes the President to determine that areas being studied for wilderness designation are not suitable for such designation and to return such areas to general use management without congressional action." 6 Op. Off. Legal Counsel 63 (1982) (Olson, Theodore B., Asst. Attorney Gen.). According to the opinion issued by the Office of Legal Counsel:

> We do not believe that the President has the legal authority to take the action being suggested by the Department of the interior. We believe that he must forward to the Congress his recommendations as to whether land should or should not be designated as wilderness and that he cannot remove land from consideration for such designation and return it to multiple use management by unilateral action.

*Id.* at 63–64. After careful analysis, the legal opinion of the Office of Legal Counsel concluded:

> We are unable to find any credible support for the argument that the President need not make recommendations to Congress as to some areas, but may in fact remove the land from further consideration without any congressional submission. The statute's language, its legislative history, administrative practice regarding previous legislation which is virtually identical, and judicial interpretation all lead to the conclusion that there is no implicit authority in the President to unilaterally release lands from further study merely because he believes them to be unsuitable. The President must make recommendations as to all areas studied by the Secretary and he must await Congress' decision as to their ultimate fate.

*Id.* at 73.

Read together, the statute, legislative history, implementing regulations, agency interpretations, court decisions, and the Attorney General's Opinion all demonstrate that the nonimpairment standard under § 1782(c) should be applied to those areas described in § 1782(a), containing minimum wilderness characteristics until Congress acts. The Sec-

retary must prevent impairment while the Secretary studies the land, through the time the Secretary and the President make their recommendations, and until Congress makes a final determination. The review period for a WSA does not terminate until Congress acts to release the area for other purposes or to preserve the area as wilderness.

■ In the present case, the area in which plaintiffs' mining claims are located was designated a WSA by the BLM on November 14, 1980. Plaintiff Robert G. Reeves located the mining claims on September 1, 1996, well after the date the land had been designated a WSA. The status of the land as a WSA continues to this date, and Congress has not made a final determination regarding the Carcass Canyon WSA's suitability for wilderness preservation. Therefore, the area in which plaintiffs' mining claims are located remains subject to the nonimpairment standard.

The BLM issued specific guidelines for applying the nonimpairment standard to individual plans of operation in the IMP. The IMP provides that for lands subject to the nonimpairment standard, "all activities ... *must be temporary uses that create no surface disturbance, nor involve permanent placement of structures.*" IMP at 5 (1995) (emphasis in original). For mining claims located after October 21, 1976, the IMP specifically states, "[w]ork towards post-FLPMA discoveries may take place, but not to the extent that impairment is caused." *Id.* at 38. In 1997, the BLM denied plaintiffs' June 1997 Mining Plan and November 1997 Mining Plan because the proposed plans would cause surface disturbance in violation of the IMP.

Plaintiffs imply that President Clinton's designation of the Grand Staircase–Escalante National Monument on September 18, 1996, which includes the land on which plaintiffs' mining claims are located, influenced the B.L.M. officials to "re-interpret the Interim Management Policy to allow 'no disturbance' whatsoever." Contrary to plaintiffs' assertions, however, the IMPs published in 1979, 1987, and 1995 all establish that the nonimpairment standard precludes activities that create any surface disturbance. *See* IMP at

9 (1995); IMP at 13 (1987); IMP at 72018 (1979). Thus, the BLM correctly applied the nonimpairment standard to deny plaintiffs' mining and exploration proposals.

**Regulatory Taking**

Although BLM correctly applied the non-impairment standard to plaintiffs' mining proposals, the takings analysis does not end there. Even if the nonimpairment standard was properly applied, plaintiffs claim that this standard goes "too far" in depriving "the owner of all or most of its interest in the property." Plaintiffs contend "the actions of the BLM in denying the plaintiffs even the right to further explore their mining claims constitutes a regulatory taking under the Fifth Amendment."

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of the Takings Clause of the Fifth Amendment is "to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *accord Conti v. United States,* 291 F.3d 1334, 1338 (Fed.Cir.), *reh'g en banc denied* (2002); *Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Florida Rock Indus., Inc. v. United States,* 45 Fed.Cl. 21, 24 (1999). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." *Pumpelly v. Green Bay & Mississippi Canal Co.,* 13 Wall. 166, 80 U.S. 166, 179, 20 L.Ed. 557 (1871).

A takings claim requires a two-step analysis in which a court first determines whether plaintiffs possess a valid property right affected by governmental action, and then, if the plaintiffs do possess a property right, the court decides if the plaintiffs "possessed a 'stick in the bundle of property rights.'" *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.), *reh'g and reh'g en*

*banc denied* (2002) (quoting *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir.2000)); *Bay View, Inc. v. United States*, 278 F.3d 1259, 1263 (Fed.Cir.2001), *cert. denied*, — U.S. ——, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002); *Karuk Tribe of Cal. v. Ammon*, 209 F.3d at 1374. A takings plaintiff must have a legally-cognizable property interest, *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed.Cir.1993), such as the right of possession, use or disposal of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *United States Shoe Corp. v. United States*, 296 F.3d 1378, 1384 (Fed.Cir.), *reh'g and reh'g en banc denied* (2002); *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1354 (Fed. Cir.2001), *cert. denied* — U.S. ——, 122 S.Ct. 648, 151 L.Ed.2d 565 (2001); *Karuk Tribe of Cal. v. Ammon*, 209 F.3d at 1375. The right of exclusion from the property "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. at 435, 102 S.Ct. 3164.

■ If a plaintiff has a valid property interest, the government "takes" that interest by destroying, physically occupying, or excessively regulating it for a public purpose. *Boyle v. United States*, 200 F.3d 1369, 1374 (Fed.Cir.2000); *see also Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 1478, 152 L.Ed.2d 517 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.") (citation omitted). Consistent with this notion, the United States Supreme Court has noted that most takings cases fall within two distinct classes:

> Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

*Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (citations omitted); *see also Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 122 S.Ct. at 1478; *Palazzolo v. Rhode Island*, 533 U.S. at 618, 121 S.Ct. 2448; *Abrahim–Youri v. United States*, 139 F.3d 1462, 1465 (Fed.Cir.1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2366, 141 L.Ed.2d 735, *reh'g denied*, 524 U.S. 970, 119 S.Ct. 14, 141 L.Ed.2d 775 (1998) (physical takings are "based on an outright governmental seizure or occupation of private property," while regulatory takings are "based on a regulatory imposition that constrains an owner's continuing use of property"). There are primarily two classes of takings claims: (1) physical, or *per se*, takings, and (2) regulatory takings. *See Yee v. City of Escondido, Cal.*, 503 U.S. at 522–23, 112 S.Ct. 1522; *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 122 S.Ct. at 1478. These different classes call for different analytical approaches. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 122 S.Ct. at 1478 ("Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc', factual inquires.") (citation omitted); *Abrahim–Youri v. United States*, 139 F.3d at 1465 (comparing the regulatory takings analysis in *Penn Central Trans. Co. v. New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) with the physical takings analysis in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. at 419, 102 S.Ct. 3164). The

regulatory takings analysis calls for a court to examine three separate criteria: (1) the character of the government action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interferes with distinct investment-backed expectations of the property owner. *Penn Central Trans. Co. v. New York,* 438 U.S. at 124, 98 S.Ct. 2646; *Conti v. United States,* 291 F.3d at 1339; *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir. 1994).

 The key issue in this case is the threshold question in any takings claim analysis, namely, whether plaintiffs possess the property right which they claim was taken by the United States. Plaintiffs assert that they "had appropriated valuable mining claims pursuant to their observations, the representations of the B.L.M., and the law." Plaintiffs argue that the prohibition of all surface disturbance on otherwise valid mining claims constitutes a regulatory taking of their property rights. Although the defendant does not dispute "that the plaintiffs had properly staked their claims," the parties disagree with respect to the scope of the mining rights plaintiffs acquired through staking these claims. The defendant argues that plaintiffs claims were "[l]imited by the fact that at the time [1996] they staked their claims, this area was in a wilderness study area." According to the defendant, plaintiffs did not possess the property right they claim was taken by the defendant because they never acquired an unlimited right to mine the claims they located.

Recently the Supreme Court reviewed its takings jurisprudence in regard to the nature of property interests and the government's ability to regulate those interests, specifically, "[w]hether a particular government action goes too far and effects a regulatory taking." *Palazzolo v. Rhode Island,* 533 U.S. at 617, 121 S.Ct. 2448. In *Palazzolo v. Rhode Island,* the Court rejected a *per se* rule which would hold that, "[p]roperty rights are created by the State. So, the argument goes, by prospective legislation the State can shape and define property rights and reasonable investment-backed expectations, and subsequent owners cannot claim any injury from lost value. After all, they purchased or took title with notice of the limitation." *Id.* at 626, 121 S.Ct. 2448 (citations omitted). Rather, the Supreme Court directed, "[t]he right to improve property, of course, is subject to the reasonable exercise of state authority, including the enforcement of valid zoning and land-use restrictions." *Id.* at 627, 121 S.Ct. 2448 (citing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

At issue in *Palazzolo v. Rhode Island* was whether the state's enforcement of its wetland regulations was so unreasonable or onerous as to compel compensation under the Takings Clause. *See id.* The Supreme Court wrote:

> Just as a prospective enactment, such as a new zoning ordinance, can limit the value of land without effecting a taking because it can be understood as reasonable by all concerned, other enactments are unreasonable and do not become less so through passage of time or title. Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable.

*Id.*

The Supreme Court "observed that a landowner's ability to recover for a government deprivation of all economically beneficial use of property is not absolute but instead is confined by limitations on the use of land which 'inhere in the title itself.' " *Id.* at 629, 121 S.Ct. 2448 (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). The *Palazzolo* Court found this to be true "because the landowner is constrained by those 'restrictions that background principles of the State's law of property and nuisance already place upon land ownership.' " *Id.* (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1029, 112 S.Ct. 2886). Although the Supreme Court declined to decide when a legislative enactment can be deemed a background principle of state law, the court made clear that "[t]he determination whether an existing, general law can limit all economic use of property must turn

on objective factors, such as the nature of the land use proscribed." *Id.*

Property interests " 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Clawson v. United States,* 24 Cl.Ct. 366, 369 (1991) (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). In this case, the restricting source of federal law is section 1782 of the FLPMA.[6] The nature of the plaintiffs' property interests, therefore, determines the extent FLPMA can proscribe the use of plaintiffs' mining claims. The government "may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1027, 112 S.Ct. 2886 (footnote omitted).

Although a validly located mining claim can entitle the locator to certain possessory rights and may give rise to a meritorious takings action, *United States v. Locke,* 471 U.S. 84, 86, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (" 'Discovery' of a mineral deposit, followed by the minimal procedures required to formally 'locate' the deposit, gives an individual the right of exclusive possession of the land for mining purposes."), the area on which plaintiffs' mining claims are located was a designated WSA before plaintiffs staked their claims. "Specifically, in analyzing a governmental action that allegedly interferes with an owner's land use, there can be no compensable interference if such land use was not permitted at the time the owner took title to the property." *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153 (1995), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

Congress' reasonable exercise of its regulatory power over mining claims is particularly broad. *See United States v. Locke,* 471 U.S. at 104–05, 105 S.Ct. 1785; *Kunkes v. United States,* 78 F.3d 1549, 1553 (Fed.Cir. 1996); *cert denied,* 519 U.S. 820, 117 S.Ct. 74, 136 L.Ed.2d 34 (1996). The *Locke* Court has provided useful guidance on how to evaluate the balance of power and rights, as follows:

> Even with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties. As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties.

> \* \* \* \* \* \*

> This power to qualify existing property rights is particularly broad with respect to the "character" of the property rights at issue here. Although owners of unpatented mining claims hold fully recognized possessory interests in their claims, we have recognized that these interests are a "unique form of property." The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired.

> \* \* \* \* \* \*

> Claimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests. In addition, the property right here is the right to a flow of income from production of the claim. Similar vested economic rights are held subject to the Government's substantial power to regulate for the public good

6. Plaintiffs' right to mine originates from the Mining Law of 1872, 30 U.S.C. §§ 21–54 (1986). However, in 1976, FLPMA § 1782 superseded the relevant sections of the Mining Law of 1872. *See* 43 U.S.C. § 1732(b) ("Except as provided in section 1744, section 1782, and subsection (f) of section 1781 of this title and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress. In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.").

the conditions under which business is carried out and to redistribute the benefits and burdens of economic life.

*United States v. Locke*, 471 U.S. at 104–05, 105 S.Ct. 1785 (citations omitted); *see also Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963) ("The United States, which holds legal title to the lands, plainly can prescribe the procedure which any claimant must follow to acquire rights in the public sector."); *Kunkes v. United States*, 78 F.3d at 1553 (finding "that the Government, as owner of the underlying fee title, maintains broad regulatory powers over the use of the public lands on which unpatented mining claims are located."); *M & J Coal Co. v. United States*, 47 F.3d at 1153 (examining the nature of plaintiff's mining interests and finding under the test articulated in *Lucas v. South Carolina Coastal Council*, that, "the logical[ ] antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1027, 112 S.Ct. 2886)); *Skaw v. United States*, 13 Cl.Ct. 7, 28 (1987), *aff'd*, 847 F.2d 842, 1988 WL 34099 (Fed.Cir. 1988), *cert. denied*, 488 U.S. 854, 109 S.Ct. 141, 102 L.Ed.2d 113 (1988) ("Until a patent issues, the United States as a fee owner, retains paramount rights and interests in the Federal lands under the claim, and maintains the authority to regulate the uses of those lands."); *Freese v. United States*, 6 Cl.Ct. 1, 11 (1984), *aff'd*, 770 F.2d 177 (Fed.Cir.1985) ("With regard to unpatented mining claims, therefore, the Government retains the right to regulate disturbance of surface resources, as well as the right to permit uses of the surface area of the claim for purposes other than mining.").

In the present case, Congress imposed the nonimpairment standard until final congressional action to further the legitimate goal of ensuring an objective, in-depth review of each WSA and preserving the status quo until each party to the decision, the Secretary, the President, and the Congress, have had an opportunity to be heard. Plaintiffs' had notice in the statute, the regulations, and the IMP. The IMP in particular clearly states in several sections that the nonimpair-

ment standard applies until Congress has acted. IMP at 1, 4, 8 (1995). Section 1782(c) of FLPMA limits the mining rights the BLM bestowed on plaintiffs in a WSA. FLPMA § 1782(c) states, "[d]uring the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands ... in a manner so as not to impair the suitability of such areas for preservation as wilderness ...." 43 U.S.C. § 1782(c). As discussed above, a WSA being reviewed for wilderness preservation remains subject to the nonimpairment standard established by § 1782(c) until Congress has acted. Because Congress has not made a final determination, the plaintiffs in this case have acquired mining claims limited by the restrictions of the nonimpairment standard.

In addition, when the Utah Division of Oil, Gas and Mining (Utah DOGM) accepted plaintiffs' proposals, the State notified plaintiffs that plaintiffs' proposals fell within the BLM regulated Carcass Canyon WSA. The acceptance from the Utah DOGM states, "[a]lthough you have complied with the requirements under the State Mined Land Reclamation Act and its interpretive Minerals Rules for small mining operations, you must still meet the requirements of the Bureau of Land Management (BLM) before commencing operations." Thus, the Utah DOGM notified plaintiffs of BLM's regulatory power over the Carcass Canyon WSA.

Plaintiffs purchased a limited right to hold, explore, and prepare their mining claims without surface impairment until Congress makes a final determination regarding the WSA. *See* IMP at 38 (1995). Because plaintiffs never acquired a mining claim free of FLPMA restraints, they do not own a property interest that was taken in this case.

## CONCLUSION

The court holds that the nonimpairment standard of 43 U.S.C. § 1782(c) applies to all Wilderness Study Areas on which Congress has not yet made a final determination regarding suitability for wilderness, regardless of the recommendations proposed by either the Secretary or the President. Because the

nonimpairment standard prohibits any surface impairment of the Carcass Canyon WSA, the BLM justifiably denied plaintiffs' Plans of Operation to mine and explore their validly staked claims. The area in which plaintiffs' claims are located had been designated a WSA prior to when plaintiffs filed their claims. Plaintiffs' possessory interests in the mining claims was limited by § 1782(c) at the time of filing. Thus, plaintiffs obtained only a limited property interest to hold and use their claims in a manner which would not impair the surface of the public lands pending congressional decision. Plaintiffs do not possess a compensable property interest in the unpatented mining claims they assert were taken by the government.

After reviewing the merits of both parties' motions for summary judgment, the court finds that no taking has occurred. Accordingly, the court **DENIES** plaintiffs' motion for summary judgment and **GRANTS** defendant's motion for summary judgment. Plaintiffs' complaint shall be dismissed.

**IT IS SO ORDERED.**